**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOMBARD PUBLIC FACILITIES CORPORATION, | ) | Case No. 17-22517 |
| | ) | |
| | ) | Hon. Jacqueline P. Cox |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF THOMAS BUCK IN SUPPORT OF THE DEBTOR'S**
**CHAPTER 11 PETITION, FIRST DAY MOTIONS AND OTHER RELIEF**

I, Thomas Buck, hereby declare under penalty of perjury:

1.      I am over the age of 18, competent to testify, and authorized to submit this declaration ("**Declaration**") on behalf of the Debtor, Lombard Public Facilities Corporation (the "**Debtor**").

2.      I am a principal in the bankruptcy and restructuring group of EisnerAmper LLP ("**EisnerAmper**").  EisnerAmper is one of the largest accounting firms in the nation with nearly 1,300 employees and 180 partners across the country and the Cayman Islands.  I, and my colleagues, Deborah Friedland and Allen Wilen, on behalf of EisnerAmper, have served as the financial advisor to the Debtor since March 2015.

3.      On July 28, 2017 ("**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 (the "**Chapter 11 Case**") of the title 11 of the United States Code (the "**Bankruptcy Code**").  EisnerAmper is the proposed financial advisor for the Debtor in the Chapter 11 Case.

4.      To enable the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case, and to preserve and maximize the value of its estate, the Debtor has requested various types of relief in the "first day" motions filed on or shortly after the Petition Date (the

"**First Day Motions**"), and will be requesting approval of other motions in the initial stages of

this Chapter 11 Case (the "**Supplemental Relief**"), described below.  I am submitting this

Declaration in support of the First Day Motions and Supplemental Relief.

## I.    BACKGROUND AND QUALIFICATIONS

5.    I am a seasoned financial advisor with approximately 18 years of experience in

corporate restructurings.  I am a Certified Turnaround Professional and a Certified Insolvency &

Restructuring Advisor.  My restructuring acumen includes operational turnarounds, financial

restructurings, divestiture transactions and orderly liquidations.  I have provided financial

consulting to both debtors and creditors involved in a number of bankruptcy cases including

Parmalat USA Corp., KidsPeace, Saint Michael's Medical Center, Best Manufacturing Group

LLC, North Oakland Medical Centers, Autobacs Strauss, and Consolidated Horticulture Group.

I have held many interim management positions for distressed companies.  Finally, I have

worked directly or managed consulting engagements in a variety of industries including

chemicals/plastics, textiles, automotive, industrial manufacturing, hospital management,

transportation and logistics, engineering and construction, and food processing.

6.    Deborah Friedland, Managing Director and head of the firm's hospitality advisory

practice, is working with me on this matter and has been since the beginning of EisnerAmper's

engagement.  She has over 25 years hospitality industry experience advising clients in

connection with the acquisition, finance, conversion and operation of various types of real estate,

with a specialty in the hospitality arena.  She has been involved in the management and

operational improvement of numerous hotels, resorts, restaurants and mixed-use properties. Ms.

Friedland received her Bachelor of Science and Master's degree in real estate finance from

Cornell University's School of Hotel Administration.

7.      Capitalized terms not otherwise defined herein shall have the meaning set forth in the Declaration of Paul Powers filed commensurately herewith in support of the Chapter 11 Petition and First-Day Motions (the "**Powers Declaration**").  The relevant history and current status of the Debtor is also set forth in the Powers Declaration.

8.      As stated, my firm and I have served as a financial advisor to the Debtor since March 2015.  In that time, I have been intimately involved in, and am familiar with, the prior operations of the Debtor and negotiations that have occurred with the major constituencies in this Chapter 11 Case, and have worked closely with the Debtor's representatives in preparing the Debtor for the filing of this Chapter 11 Case.  As a result of my time with the Debtor, my review of relevant documents and my discussions with members of the Debtor's management team, its Managers (including the Hotel Manager, Restaurant Manager, and the Asset Manager), and my colleagues at EisnerAmper involved in this engagement, I am generally familiar with the Debtor's day-to-day operations, historical operating results, business affairs, financial condition, and books and records.  In making this Declaration, I also have relied on information and materials that the Debtor's personnel and Managers have gathered, prepared, verified and/or provided to me for my benefit in preparing this Declaration.  If called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## II.     <u>HISTORAL OPERATING RESULTS AND CURRENT STATUS OF DEBTOR</u>

9.      As noted in the Powers Declaration, at its inception (a) the Debtor expected the Project would service the increasing demand for Hotel space from major employers, groups, and meeting travelers in DuPage County, home to some of Illinois' most affluent suburbs, and (b) the Project, with its expansive conference facilities, was expected to encourage commercial and

residential development in the Village and surrounding areas.  To date, much of this growth did

not materialize.

10.     Also, as noted in the Powers Declaration, the U.S. economy entered into a

recession in December 2007 followed by a slow economic recovery that did not take root until

2010.  Despite improvements in the overall economy, multiple factors have caused the operating

results of the Hotel to stagnate.  In recent years, the surrounding western suburban communities

have experienced an increase in supply of new hotels and/or the majority of the hotels considered

competitive with the Hotel have completed or are in the process of completing extensive

renovations.  In contrast, the unfavorable market factors negatively impacting the projected

revenues, coupled with the debt service obligations imposed under the Indenture, has rendered

the Debtor incapable of setting aside funds for several years to complete similarly needed

renovations at the Project.  Making matters worse, the Chicago Downtown submarket has also

seen an increase in new hotels in recent years, and many large downtown convention hotels have

for some time been offering lower rates to secure group demand, thereby putting downward

pricing pressure on the Hotel.  In addition, over the last five years several major employers in the

area, including Sara Lee, Veolia, and most recently McDonalds, have relocated from the western

suburbs to the Chicago Downtown submarket as a result of aggressive tax incentives, better

transportation links, and greater access to young talent. These corporate relocations have led to a

further depletion of the originally projected customer pool for the Hotel.

11.     Faced with a larger room count and capital improvement constraints, the Hotel

Manager was forced to adopt a more aggressive pricing strategy and redirect marketing efforts to

attract typically lower-rated group and leisure business, resulting in occupancy levels at or

around seventy percent (70%).  Group and leisure demand segments are typically more-price

sensitive than corporate groups and individual business travelers.  Although this shift in strategy

resulted in the Hotel maintaining occupancy levels at rates commensurate with or better than its

competitors, food and beverage revenue, income from other departments including audio visual

and meeting room rental, and the overall profitability of the Hotel, has declined.

12.    The operating revenue and income for the Project for each year since opening is

reflected below:

| CONSOLIDATED REVENUE | |
| --- | --- |
| YEAR | ACTUAL |
| 2008 | $34,871,000 |
| 2009 | $29,758,000 |
| 2010 | $28,171,000 |
| 2011 | $29,661,000 |
| 2012 | $29,699,000 |
| 2013 | $30,036,000 |
| 2014 | $31,622,000 |
| 2015 | $30,720,000 |
| 2016 | $30,644,000 |

| CONSOLIDATED ADJUSTED OPERATING INCOME | |
| --- | --- |
| YEAR | ACTUAL |
| 2008 | $7,897,000 |
| 2009 | $6,416,000 |
| 2010 | $5,288,000 |
| 2011 | $6,028,000 |
| 2012 | $5,893,000 |
| 2013 | $6,522,000 |
| 2014 | $6,809,000 |
| 2015 | $5,824,000 |
| 2016 | $5,665,000 |

13. Although the Project has consistently generated operating income of between $5 and $8 million per year before debt service),  the income is well below the original projections set forth in the 2005 Market Study prepared by HVS (as defined in the Powers Declaration). The available revenues from the Project have enabled the Debtor to remain current on the payment of all operating expenses of the Project, but as noted below, the failure to meet projections ultimately impeded the payment of debt service, leaving the Debtor without adequate funds to make needed capital improvements.

14. In summary, the combined impact of the 2007-2009 U.S. recession, reduced corporate travel to the area, the relocation of major employers in the area, a decrease in meeting and association demand, and an increase in the lodging supply in the local market and the Downtown Chicago submarket have contributed to the lower than forecasted operating performance of the Project.  It is also noteworthy that operating income has declined for the last two years despite relatively stable total revenues for the same period. The decline in profitability is attributed to the change in customer segmentation combined with increasing operating expenses associated with an aging property and the constraint in capital available for reinvestment.

15. As noted in the Powers Declaration, beginning in 2010, (a) the Debtor did not have the funds to remit the required debt service payments under the Indenture, which shortfalls were covered by monies from Reserves, and starting in 2014, holders of the Bonds have received partial or no debt service payments given that the Reserves were depleted, and (b) pursuant to the Indenture and as a result of the defaults thereunder, ACA is the Controlling Party with respect to the Bonds for certain purposes and is entitled to direct, and has directed, the Indenture Trustee's actions in response to the foregoing defaults.

## III.    NEGOTIATIONS LEADING TO FILING THE CHAPTER 11 CASE AND THE CONSENSUAL RESTRUCTURING

16.    Since late 2013, the Debtor has engaged in extensive discussions with ACA and certain major holders of Bonds, the Village, Hotel Manager, and Restaurant Manager regarding a consensual restructure.[1]  What was clear early on in those negotiations, and what remains clear today, is that: (a) based on market prices for similar hotels, proceeds from a foreclosure of the Project will result in a recovery of less than one-third of the outstanding balance of the A Bonds, with no remaining funds available for any other Bonds, and (b) the continued operation of the Debtor, and a long-term restructure of the Bonds, through a Chapter 11 Plan will likely provide a far superior return for holders of the Bonds ("**Bondholders**") and other parties in interest, than would a forced sale.

17.    The negotiations necessarily had to take into account the current base level performance in relation to current market conditions and future growth potential in relation to sustained capital reinvestment. The desire to successfully restructure the Bonds was coupled with the equally compelling need to ensure the future vitality of the Project.

18.    ACA has labored long and hard to bring the principal Bondholders into the fold. Eventually, a majority of the Bondholders (the "**Consenting Bondholders**"), including ACA, who itself owns a significant amount of the A-2 Bonds in its own right and certain other Bondholders, who together hold a majority in amount of the Bonds reached a consensus pursuant to which they are committed to implementing a consensual restructuring of the Bonds with all possible haste: the Consenting Bondholders represent 83.54% of the A-1 Bonds, 100% of the A-2 Bonds, 56.58% of the B Bonds, and 43.12% of the C Bonds.

---

[1]    As is more fully set forth in the Powers Declaration, in 2011 the Debtor did attempt a Tender (as defined therein) to redeem certain of the Bonds on a discounted basis but the threshold requirements were not met and it proved unsuccessful.

19.     The negotiations among the Debtor, ACA and the Consenting Bondholders were predicated upon a proposed restructuring of the Bond obligations through the filing of a chapter 11 case and the confirmation of a plan of reorganization (the "**Plan**") therein (collectively, the "**Consensual Restructuring**").[2]

20.     The discussions among the Debtor, ACA and the Bondholders moved on parallel tracks with the negotiations with the Managers. The Debtor and ACA approached the Hotel Manager to secure its support for the Consensual Restructuring and to negotiate modified terms of the Hotel Management Agreement aimed at enhancing the chances that the Consensual Restructuring would succeed. These negotiations have entailed a substantial overhaul of the Hotel Management Agreement; and reaching an accord on a viable capital program that addresses needed structural and mechanical repairs and maintains brand standards. Throughout the negotiation of the Consensual Restructuring, the Hotel Manager, the Debtor, and/or ACA have been engaged in intensive negotiations to resolve disputes over the capital funding required under the terms of the Hotel Management Agreement (the "**Capital Funding Disputes**"). According to the Hotel Manager, failure to resolve the Capital Funding Disputes would have resulted in termination of the Hotel Management Agreement. The dilemma facing the parties was devising a capital program which addressed critical needs of the Project within the rigid funding constraints.

21.     After generating countless iterations of capital funding scenarios, the Debtor and ACA recently reached an agreement with the Hotel Manager that calls for the following substantial and beneficial changes, among others, to the Hotel Management Agreement (the "**Revised HMA**"), upon the effective date of the Plan (the "**Effective Date**"): (a) convert the

---

[2] EisnerAmper and FTI Consulting, Inc., financial consultants to the Indenture Trustee ("**FTI**"), have established a financial platform that supports the terms of the Consensual Restructuring and which will serve to evidence the underlying feasibility of the eventual Plan.

management fee to a variable rate, thereby insuring that the Hotel Manager is now operating

under a market rate performance based platform; (b) eliminate approximately $6 million in

unpaid subordinate management fees and "Key" money, and other amounts that would otherwise

be due and owing to the Hotel Manager upon the termination of the HMA and adoption of the

Revised HMA (the "**Hotel Termination Claims**"); (c) subordinate management fees do not

commence until the fourth year after the Effective Date, resulting in a savings of approximately

$1,000,000; (d) resolve the Capital Funding Disputes through the implementation of a property

improvement plan  over the initial five years of the Consensual Restructuring which calls for (i)

approximately $13.7 million to be set aside during that time for such improvements from current

operating reserves and future operating set-asides, the Village contributions (hereafter

explained), and operating revenues that would otherwise be available to pay debt service, plus

(ii) an additional $1,000,000 in new Key money to be paid by the Hotel Manager, and (e)

extends the current term of the Hotel Management Agreement, which would expire in five years,

by an additional 20 years.  Under the Consensual Restructuring there is projected approximately

$25 million that will be set aside for capital improvements over the initial 10 years.

22.    The Debtor and ACA have engaged in similar negotiations with the Restaurant

Manager to a much lesser degree.  Thankfully, the terms of the existing Restaurant Management

Agreement are favorable to both sides, and the capital concerns are not nearly so acute.

23.    The current Restaurant Management Agreement required little in the way of a

substantive overhaul, as the fees thereunder are within market standards, and the only critical

deal point was the extension of the existing term that also expires in five years, for an additional

20 years to match the Hotel's extension (the "**Revised RMA**").  The Revised RMA would

replace the existing Restaurant Management Agreement on the Effective Date. The extended

terms of both Existing Management Agreements insure continuity and insulate the Debtor from

having to search for and recruit new managers within the next five years, which change would be

extremely costly, not to mention that the closer it gets to the expiration of the existing term, the

more leverage the Managers could potentially wield in future negotiations.

24.      In addition, the Debtor and ACA early on approached the Village to garner its

support for the Consensual Restructuring.  As referenced below, after nearly three years of

negotiations, the contributions of the Village to the Consensual Restructuring will fill in

significant gaps in cash flow and add the critical funding layer necessary for capital needs, and

ultimately resulting in a feasible plan to be presented for confirmation.

25.      As noted, in the Powers Declaration, the Debtor has now entered into restructure

support agreements with ACA and the Hotel Manager dated July 19, 2017 (the "**Hotel RSA**");

with ACA and the Restaurant Manager dated July 19, 2017 (the "**Restaurant RSA**"); and with

ACA, the Village and the Consenting Bondholders dated July 25, 2017 (the "**Global RSA**",

together with the Hotel RSA and the Restaurant RSA, the "**RSA(s)**") pursuant to which each of

these parties have agreed to support and/or contribute to the consummation of the Consensual

Restructuring through the filing of this Chapter 11 Case and the confirmation of the Plan that

will be presented by the Debtor, ACA, and certain Consenting Bondholders (the "**Plan Support**

**Parties**"). The general terms of the Consensual Restructuring as set forth in the Summary of Plan

Term Sheet that is attached hereto as **Exhibit A**.

26.      The RSAs also set forth a number of deadlines intended to facilitate the

expeditious resolution of the Chapter 11 Case and/or to maintain the continued support of certain

of the Plan Support Parties and/or the Managers, and the failure to achieve these milestones

could give certain of such parties the right to terminate their respective RSAs.  As more fully set

forth in the RSAs, these deadlines include: (i) obtaining Court approval of the RSAs, the

Prepetition Lien Claims Motion (hereafter defined), the Customer Benefits/Programs Motion

(hereafter defined), and the Prepetition Taxes Motion (hereafter defined) within 30 days after the

Petition Date, (ii) obtaining Court approval of the Utilities Motion (hereafter defined) within 20

days after the Petition Date, (iii) obtaining Court approval for the provisional assumption of the

Existing Management Agreements within 90 days of the Petition Date, and (iv) achieving the

effective date of the Plan by December 31, 2017.

27.     The Consensual Restructuring provides a potential recovery of seventy-seven per

cent (77%) (plus interest) to the Series A Bondholders (based on 7/1/17 outstanding balances), a

potential recovery of nearly eighty-seven per cent (87%) (plus interest) to the Series B

Bondholders (based on 7/1/17 outstanding balances), long-term management agreements for the

Managers, a significant set-aside for needed capital improvements, necessary funding for this

Chapter 11 Case, payment of Operating Expenses, and a continuing fully functional and vibrant

hotel and convention center for the western suburban market that will continue to employ over

290 full and part-time employees.

28.     One known party that has not signed onto the Consensual Restructuring and who

has expressed opposition to the Chapter 11 Case is the Asset Manager, who developed and

managed the Project from its inception.  As noted in the Powers Declaration, the Asset

Management Agreement was terminated recently by the Debtor for reasons that include, without

limitation, the Asset Manager's breach of a provision requiring the maintenance and posting of a

certain letter of credit.

29.     The Debtor believes that the Asset Manager holds or controls more than 50% of

the C Bonds.  As provided in the Indenture, the C Bonds are subordinate to both the A Bonds

and the B Bonds and cannot be paid unless and until the A and B Bonds are paid in full. Inasmuch as the A and B Bonds will not be paid in full, holders of C Bonds will receive no distribution under the Consensual Restructuring, which is consistent with the terms of the Indenture.

30.    The Asset Manager asserts that he is owed several million dollars in unpaid pre-Petition Date management fees under the Asset Management Agreement.  However, the Debtor believes there may be grounds to contest the payment of such claims and is in the process of investigating potential claims that may exist against the Asset Manager.  In an effort to resolve these differences, the Debtor in recent months has engaged the Asset Manager in settlement discussions, which negotiations are ongoing, to try to resolve these differences, however, no resolution has yet been reached.

## IV.    FIRST DAY MOTIONS

31.    A critical element in the Debtor's attempt to maximize its chances to successfully reorganize pursuant to the Consensual Restructuring is approval of each of the First Day Motions.  Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the bankruptcy estate to be administered effectively and to give the Debtor its best chance to effect the Consensual Resolution and maximize the value of the Debtor's estate.

32.    Failure to grant such relief would have a serious negative effect on the Debtor's efforts to continue operating during the Chapter 11 Case.

33.    Factual information in support of the First Day Motions is provided below, in the Powers Declaration, and in the corresponding motions.

## A.    Cash Management Motion

34.     The Debtor is filing a motion for the entry of an order (I) authorizing: (a) maintenance of its existing bank accounts, (b) continued use of its existing cash management system, (c) continued use of its existing business forms, and (d) continued use of its existing books and records; and (II) waiving the investment and deposit requirements of 11 U.S.C. § 345(b) (the "Cash Management Motion").

35.     As stated, the Debtor has no actual employees, and it is the Managers and their employees that have historically performed all necessary services to operate the Hotel and the Restaurant, including management functions, human resource, reservations/booking, event planning accounting, marketing, risk management, and other support services under the respective management agreements.

36.     The Managers' payroll, management fees, and other contracted services, as well as third party vendors, are paid via check and wire pursuant to the Cash Management System hereinafter defined and described.

37.     A limited number of expenses of the Debtor cannot be paid from the cash generated from the Project's operations.   The expenses, such as audit fees, professional fees, and D&O insurance, are funded through the Administrative Expense Fund or the Available Revenue Fund (as those capitalized terms are defined in the Glossary), upon request and approval of the Indenture Trustee and in accordance with the Indenture, which accounts are under the control of the Indenture Trustee as described below. The Managers' payroll, management fees, and other contracted services, as well as third party vendors, are paid via check and/or wire pursuant to the Cash Management System.

**(i)      The Debtor's Existing Bank Accounts and Flow of Funds in the Debtor's Cash Management System**

38.     As of the Petition Date, there are thirty five (35) bank accounts (collectively, the "**Bank Accounts**"), thirty-three (33) of which are at Amalgamated Bank and Trust Company of Chicago ("**Amalgamated**") and two (2) of which are at Bank of America ("**BOA**") that relate to the Project.  The Bank Accounts consist of two general groupings of accounts: (a) those that receive cash generated from the Project's operations which are then used to pay Operating Expenses in the ordinary course of business (collectively, the "**Operating Accounts**") and (b) those that receive excess cash from operations, are under the control of the Indenture Trustee, constitute part of the Trust Estate (as defined in the Indenture), which are held in trust for the benefit of the Bondholders, and may only be used in accordance with the terms of the Indenture (the "**Trustee Accounts**").

39.     There are four (4) Operating Accounts from which either the Hotel Manager or the Restaurant Manager may draw funds to operate.  The Hotel Manager and Restaurant Manager also maintain onsite petty cash for normal business operations and certain per diem customer relationships. The availability of funds in these accounts for the Hotel Manager and Restaurant Manager is limited by, and subject to, the Indenture and the Management Agreements and certain cash management agreements currently in place.  There are thirty-one (31) Trustee Accounts that are controlled by the Indenture Trustee.  A schedule of the Bank Accounts is attached hereto as **Exhibit A** and is incorporated herein by reference.

40.     The Operating Accounts, Indenture and the related cash management system govern the payment of Operating Expenses at the Project (collectively, the "**Cash Management System**").  The Cash Management System relates to the following accounts: (i) the Hotel Manager Operating Account (ending in 9144) (the "**Hotel Manager Operating Account**") and the Hotel Manager Pooling Account (ending in 2039); and (ii) the Restaurant Manager Operating

Account (ending in 9128) (the "**Restaurant Manager Operating Account**").  The flow of funds

from these principal accounts can be described as follows:

    a.    **Hotel**

The Hotel Manager Operating Account receives payments from multiple sources including cash payments, credit card receipts from settlements from American Express and Merchant Services, direct customer deposits/payments, and receipts from third party booking entities. Disbursements from the Hotel Manager Operating Account include (i) electronic transfers for state tax EDI payments, management fees and other contracted services provided by affiliated entities, (ii) transfers to the Hotel Manager Pooling Account (ending in. 2039) for ultimate funding of payroll related expenses and accounts payable that the Hotel Manager pays on behalf of the Debtor, and (iii) agent fees, and credit card fees.

    b.    **Restaurant**

The Restaurant Manager Operating Account receives payment from multiple sources including cash payments, credit card receipts, direct customer deposits/payments, and receipts from third party booking entities. Disbursements from the Restaurant Manager Operating Account include: (i) electronic transfers for state tax EDI payments, transfers to ADP for Restaurant Manager payroll/payroll taxes/fees, credit card settlements fees, currency order debits and account fees; and (ii) checks disbursed for the Restaurant Manager fees and other contracted services provided by affiliated parties, petty cash, and accounts payable.

    41.    The Cash Management System enables the Debtor and the Managers to: (a)

monitor closely the collection and disbursement of funds; (b) request draws from the Operating

Accounts; (c) forecast and report their cash position with greater certainty; (d) comply with the

cash management requirements of the Indenture; (e) ensure cash availability; and (f) reduce

administrative expenses by facilitating the movement of funds.

    42.    Once the Operating Expenses of the Project are paid in accordance with the Cash

Management System, the excess cash flow is then transferred to the Indenture Trustee, who

holds the monies as part of the Trust Estate for the benefit of the Bondholders in accordance with

the Indenture.  This excess cash flow is initially deposited into the Available Revenue Fund and

then potentially into one of the other Trustee Accounts in accordance with the terms of the

Indenture (the "Waterfall").  Once deposited into a Trustee Account, such monies can then only be used in accordance with the terms of the Indenture.  Once the monies are transferred to the Indenture Trustee, subject to the Indenture the Debtor may request use of those funds to pay, for example, capital expenditures, debt service or administrative expenses.  Given that an Event of Default has occurred under the Indenture, the Controlling Party has discretion to direct the Indenture Trustee with respect to such requests, subject to the terms of the Indenture.  The Debtor does not have the ability to withdraw or access the monies in the Trustee Accounts without the Indenture Trustee, acting at the direction of the Controlling Party, approving a request for use from the Debtor.  The monies in the Trustee Accounts are otherwise available to pay debt service given the outstanding defaults.

43.     The Debtor has included the Trustee Accounts in the Cash Management Motion as a precaution given that they are controlled by the Indenture Trustee and part of the Trust Estate.  Any disruption of the Trustee Accounts would be detrimental to the Debtor, its estates and creditors given that, subject to further order of the Court, the monies in the Trustee Accounts are expected to be used to finance the administrative costs of this Chapter 11 Case and certain capital expenditures to be incurred during this Chapter 11 Case.  Moreover, any disruption in the Trustee Accounts would be detrimental to the Indenture Trustee's administration of these Trustee Accounts on behalf of the Bondholders.

**(ii)    Relief Requested**

**(a)     The Debtor should be granted authority to maintain its existing bank accounts.**

44.     As above described, the Operating Accounts make up a centralized Cash Management System that the Debtor, through the Managers, uses to collect, transfer, and disburse funds, and to record accurately such collections, transfers, and disbursements.

45.     Notwithstanding the UST guideline that new bank accounts be opened, I believe that the Debtor would experience undue hardship if required to close the Operating Accounts and open new accounts at another bank.  Among other things, resultant delays, confusion, and disruption of the Debtor's business are expected in the event that the Debtor was forced to close its existing Operating Accounts and open new accounts.

46.     In order to ensure immediate access to funds on hand in the Operating Accounts, avoid delays in payments to administrative creditors, and ensure as smooth a transition into Chapter 11 as possible with minimal disruption, it is important that the Debtor be permitted to maintain its Operating Accounts.  Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Operating Accounts be deemed debtor-in-possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

47.     To protect against inadvertent payment of prepetition claims, the Managers' personnel and the personnel at Amalgamated with whom the Debtor, through the Managers, customarily deal have been instructed and will be reminded how to distinguish readily between prepetition and postpetition obligations without closing existing accounts and opening new ones. The Debtor has been in contact with Amalgamated and/or its counsel prior to the Petition Date, in part to address such concerns.  Further, to ease the task of distinguishing between prepetition and postpetition checks, the Debtor will: (i) leave a gap in its check numbers (rounding subsequent check numbers up to the next hundred) such that check numbers preceding the gap will be readily identifiable as prepetition checks and the check numbers following the gap will be

readily identifiable as postpetition checks; or (ii) otherwise utilize existing software to implement a monitoring system which has the same effect.

48.    I believe that if the relief requested in the Cash Management Motion is granted, the Debtor will use its best efforts to not pay, and Amalgamated will not be directed to pay, any debts incurred before the Petition Date, except to the extent the Court may authorize the payment of such debts.[3]  The Debtor is confident it can avoid such prepetition payments and has been particularly attuned to this issue prior to the Petition Date.

49.    The Debtor therefore seeks to be excused from the UST's requirement that the Bank Accounts be closed.

50.    Finally, as noted earlier, the Debtor has included the Trustee Accounts in the Cash Management Motion as a precaution.  The Trustee Accounts are part of the Trust Estate and are controlled by the Indenture Trustee.  The Debtor does not control or have direct access to the funds in the Trustee Accounts.  Therefore, the Trustee Accounts should not be deemed and do not constitute debtor-in-possession accounts or otherwise impacted by the filing of this Chapter 11 Case.  However, given that the Trustee Accounts have been in place for at least ten (10) years and allow the Indenture Trustee to administer its obligations under the Indenture, the Trustee Accounts cannot be disrupted by the filing of this Chapter 11 Case.  If and only to the extent that the Trustee Accounts are arguably viewed as debtor-in-possession accounts, the Trustee

---

[3]     For the avoidance of doubt, paragraph 48 does not relate to payment of the currently outstanding B Bonds from tax revenues (the "**Pledged Tax Revenues**") received by the Debtor or the Indenture Trustee pursuant to that certain Tax Rebate Agreement (as defined in the Glossary) by and between the Debtor and the Village. Pursuant to the Indenture, these tax revenues are deposited in the Trustee Accounts and used exclusively for payment of debt service on the B Bonds. As noted in paragraph 50, the Trustee Accounts should not be deemed debtor-in-possession accounts or otherwise impacted by the filing of this Chapter 11 Case. Payments on the B Bonds from the Pledged Tax Revenues in the Trustee Accounts will continue during the Chapter 11 Case.

Accounts should be treated in the same manner as the Operating Accounts so that there is no disruption in the administration of such accounts.

      (b)    **The Debtor should be authorized to continue using its existing Cash Management System.**

51.    In order to lessen the disruption caused by the Chapter 11 Case and maximize the value of the Debtor's estate, the Debtor also requests authority to continue to use the existing Cash Management System, as it may be modified as required by the Debtor in the exercise of its business judgment with the consent of the Indenture Trustee, acting at the direction of the Controlling Party.

52.    The Cash Management System allows the Debtor, the Indenture Trustee and the Managers to manage all of the cash flow and disbursement needs and includes the necessary account mechanisms to enable the Debtor to trace funds, ensure that all transactions are adequately documented and readily ascertainable, and comply with applicable requirements. The Debtor will continue to maintain detailed records reflecting any transfers of funds.

53.    The Debtor has employed the Cash Management System for many years, and the Cash Management System constitutes its ordinary business practice.  Because of the integrated financial structure built into the operation of the Project pursuant to the Management Agreements, it would not be possible to establish a new system of accounts and a new cash management and disbursement system without incurring substantial additional costs and expenses, and imposing delays and inconveniences that could threaten the viability of the Debtor's ongoing operations.

      (c)    **The Debtor should be granted authority to continue to use its existing business forms.**

54.     In order to minimize the expenses borne by the estate, the Debtor also requests that it be permitted to continue to use its existing correspondence and business forms (including but not limited to letterhead, invoices, etc.) without alteration or change to those used before the Petition Date.  Changing correspondence and business forms would be unnecessary, burdensome to the Debtor's estate, expensive, and disruptive to business operations.

55.     If the Debtor is not permitted to continue to use its existing checks, if applicable, and business forms, the resulting prejudice will include delay in the administration of the Debtor's business operations and unnecessary cost to the Debtor's estate to print new checks and forms.  For these reasons, the Debtor requests that it, through the Managers, be authorized to use existing business forms without placing the label "Debtor in Possession" on each such form.

**(d)     The Debtor should be granted authority to continue to use its existing books and records.**

56.     In order to minimize expenses to the Debtor's estate and avoid time-consuming administrative burdens, the Debtor also requests that it be authorized to continue to use its existing books and records.

57.     Opening new books and records would be burdensome to the estate and disruptive to the Debtor's business operations.  For these reasons, the Debtor requests that it be authorized to continue using its existing books and records, provided that the Debtor makes appropriate notations in the books and records to reflect the Petition Date and the commencement of the Chapter 11 Case. [4]

**(e)     Cause exists to waive the investment and deposit guidelines of section 345(b) of the Code.**

---

[4]     Here again, the Debtor has minimal operations; the Project is operated by the Managers.  It would be unduly burdensome for the Managers to alter its books and records given the centralized cash management systems these enterprises employ.

58.     As set forth above, the Debtor, in the ordinary course of its businesses, maintains the Bank Accounts with Amalgamated and BOA. The Debtor understands Amalgamated and BOA to be financially stable FDIC-insured banking institutions.. Consequently, it is unnecessary and unduly burdensome to require the Debtor to demand that Amalgamated and BOA issue bonds in connection with the Bank Accounts.

59.     It is my understanding that BOA is on the UST's approved list of depository banks, however, Amalgamated currently is not.  I am in the process of working with Amalgamated and the UST's office to have Amalgamated execute a Uniform Depository Agreement with the UST's office that would permit the Debtor to continue to utilize its accounts at Amalgamated, but which process may take some time.  As such, the Debtor requires and requests additional time to enable Amalgamated reach an agreement with the UST's office concerning the Uniform Depository Agreement required by the UST's office.  Consequently, I believe cause exists to waive the investment and deposit requirements under section 345(b) of the Code.

60.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest, and will enable the Debtor to efficiently administer its estate in the Chapter 11 Case without disruption.

**B.**     **Cash Collateral and DIP Financing Motion**

61.     By its motion for authority to enter into postpetition secured financing and for use of cash collateral (as defined by section 363 of the Bankruptcy Code, "**Cash Collateral**") (the "**DIP Motion**"), the Debtor seeks approval of, among other things: (a) use of the Cash Collateral of the Indenture Trustee under the Indenture, the Debtor's prepetition secured lender; and (b) postpetition financing also provided by the Trustee (the "**DIP Facility**"), under the terms of the

Indenture as modified by the Interim and Final Debtor In Possession Financing Orders (the "**DIP Orders**") referenced in and/or attached to the DIP Motion (the "**DIP Agreement**").

62.    Under the DIP Agreement, the Debtor shall have consensual use of Cash Collateral to pay Operating Expenses and the Debtor will be authorized to obtain loans under the DIP Facility from the funds in the Trustee Accounts (other than the Second Tier Debt Service Funds (as defined in the DIP Orders)) (the "**Trust Estate Funds**") held by the Indenture Trustee in the amounts set forth in the budgets to be attached to the DIP Orders, to pay expenses other than Operating Expenses, such as professional fees, capital expenditures, and other administrative expenses.  The maximum amount under the DIP Facility shall not exceed the aggregate balance of such Trust Estate Funds.  The Indenture Trustee shall advance the loans, from such Trust Estate Funds as of the Petition Date, and from those funds thereafter deposited into such Trust Estate Funds pursuant to the Waterfall from funds in the Operating Accounts, which deposits shall be adequate protection for the use of Cash Collateral.  The amount of such Trust Estate Funds as of the Petition Date approximated at least $2.8 million.  The loans under the DIP Facility shall bear interest at the rate of four and one-half percent from the date of funding until repaid in full or forgiven, and upon and during the occurrence of a Termination Event (defined in the DIP Order), the loans shall bear interest equal to six and one-half percent (6½%).  Additionally, as adequate protection for use of Cash Collateral and in consideration for the DIP Facility, and subject to the terms of the DIP Order, including an approval process described in the DIP Order, the Debtor is to pay, or reimburse the Indenture Trustee, ACA, and the Consenting Bondholders for certain reasonable post-Petition Date costs, fees and expenses, including fees and expenses of their respective attorneys and financial advisors.  Finally, under the terms of the DIP Facility, if the DIP Facility terminates as of the effective date of a Plan that

is consistent with the terms of the Global RSA, then any obligations under the DIP Facility, other than the foregoing described secured parties professional fees, shall be forgiven.

63.     I have reviewed and analyzed the Debtor's anticipated cash needs and prepared a 13-week projection (as updated from time to time in accordance with the terms of the DIP Agreement, the "**Budget**") outlining the Debtor's anticipated postpetition cash needs in the initial 13 weeks of the Chapter 11 Case. I believe that the Budget is an accurate reflection of the Debtor's funding requirements over the identified period assuming stable operating performance and a timely efficient proceeding, and will allow it to meet its obligations – including the administrative expenses of the Chapter 11 Case, and is reasonable and appropriate under the circumstances during the Budget period.

64.     Based on this forecast, I have determined that the Debtor requires access to Cash Collateral and postpetition financing to provide sufficient liquidity to efficiently administer the Debtor's estate during the Chapter 11 Case. Among other things, the Debtor needs such liquidity to satisfy the Hotel and Restaurant Operating Expenses, pay taxes, pay professionals, make other payments that are essential or appropriate for the efficient administration of the Debtor's estate. The Debtor's ability to continue making such payments during the Chapter 11 Case is essential to the preservation of its assets during the pendency of this case.

65.     The Debtor requires interim approval of the DIP Facility. The Debtor does not have sufficient cash flow to meet its anticipated expenses, including, in particular, the professional fees that will be incurred during the Chapter 11 Case.

66.     Additionally, approval of the DIP Facility provides certainty that the Debtor will continue to operate until it can complete and then present for approval the necessary Plan related documents in compliance with the Consensual Restructuring.

517763                                    23

67.     Accordingly, without the immediate relief requested in the DIP Motion, I believe that the Debtor faces a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and the DIP Facility will ensure the Debtor has sufficient funds to preserve and maximize the value of its estate, and responsibly administer the Chapter 11 Case.

68.     The Debtor does not have alternative sources of financing readily available. All of the Debtor's assets are encumbered under the Indenture which restricts the availability of, and options for, alternative postpetition financing.  ACA has also made clear that it would not consent to "priming" DIP financing provided by a third party.  As a result, I do not believe third-party DIP financing would be reasonably obtainable.

69.     For the foregoing reasons, I believe that the relief requested in the DIP Motion is in the Debtor's best interests and will enable the Debtor to preserve and maximize the value of its estate.

**C.     Prepetition Taxes Motion**

70.     The Debtor is filing a motion to pay prepetition sales, use, trust fund and other similar taxes and related obligations (the "**Prepetition Taxes Motion**").

71.     In connection with the Debtor's operation of the Project in the ordinary course of business, the Debtor incurs various tax obligations to, among other taxing authorities, the Village of Lombard, DuPage County, and the State of Illinois (each a "**Taxing Authority**" and collectively, the "**Taxing Authorities**") for, among others, occupation taxes and certain licenses and permits required by the Debtor to conduct its business in the ordinary course (each a "**Tax**," and collectively, the "**Taxes**").

72.     In the ordinary course of business, the Debtor, through its Managers, collects various Taxes, including state and local sales and use taxes, from customers, independent

contractors, and other third parties.  The Taxes are paid to the Taxing Authorities in the ordinary

course by the Managers from funds of the Debtor. To the best of its knowledge, as of the Petition

Date, the Debtor was current on all then outstanding Taxes except for certain Taxes which had

accrued as of the Petition Date but were not yet due.

73.     The Debtor estimates that as of the Petition Date, it owes approximately

$188,763, based on a six month average of monthly accruals for such Taxes.

74.     I believe that any dispute or delinquency caused by the Debtor's failure to pay the

Taxes could have adverse effects on the Debtor's Project.  Among other things, Taxing

Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic

stay, and pursue other remedies that may harm the Debtor's estate.  Furthermore, it is my

understanding that certain officers and directors of the Debtor or its Managers might be subject

to personal liability for failure to pay certain Taxes which could distract those key individuals

from their duties related to the Debtor's Consensual Restructuring.  Finally, Taxing Authorities

could audit the Debtor or prevent the Debtor from continuing their business, which, even if

unsuccessful, would unnecessarily divert the Debtor's attention away from the reorganization

process and cause disruptions to the Debtor's business.

75.     I believe that the relief requested in the Prepetition Taxes Motion is in the best

interests of the Debtor's estates, their creditors, and all other parties in interest, and will enable

the Debtor to continue to operate their business in chapter 11 without disruption.

**D.**     **Customer Benefits/Programs Motion**

76.     The Debtor is filing a motion to maintain and administer existing customer

programs, customer deposits, and honor prepetition customer obligations relating thereto (the

"**Customer Benefits/Programs Motion**").

77.     Prior to the Chapter 11 Case, the Debtor, through its Managers, developed

programs and policies, many of them customary in the hospitality industry, designed to foster

and maintain positive relationships with its Hotel and Restaurant customers (the "**Customers**")

and, as a result, these programs, as more fully explained in paragraph 79 below (the "**Customer**

**Programs**"), enable the Debtor to meet competitive pressures and generate revenues.

78.     The Debtor operates in highly competitive markets where the quality of the

customer experience is a defining factor in differentiating the Debtor from its competitors.  The

Debtor relies heavily on Customer Programs to ensure a customer experience that surpasses

expectations, with the goal of driving repeat business, attracting new customers, and ultimately

maintaining and increasing revenues and profitability.  If the Debtor fails to maintain and honor

Customer Programs, it will put at risk its most valuable intangible asset – customer brand loyalty

and goodwill.  Any loss of customers to its competitors would not only jeopardize the Debtor's

bottom line, it would threaten the ability to successfully reorganize.  As a result, the continuation

of the Customer Programs, and the honoring of the obligations arising thereunder, in the ordinary

course is necessary to the fair and responsible administration of the Chapter 11 Case and

essential to maximizing the value of the Debtor's assets.

79.     The Customer Programs and their importance to the Hotel and/or Restaurant

include, without limitation, the following: [5]

a.     Hotel Customer Loyalty Program – The Debtor's most prevalent customer loyalty

program is the Hotel's Starwood Preferred Guest Program ("SPG") where customers earn

points in a variety of ways including overnight stays at Starwood brand hotels, and use of

other partner program services. Loyalty members build up points for upgrades, free room

---

[5]     The described Customer Programs herein provide an overview of the Debtor's most significant
Customer Programs.

stays and perks like free wifi and late check out, among other benefits.  The loyalty

program provides the Hotel with a variety of benefits including, most importantly, brand

loyalty.  According to the Hotel Manager, approximately sixty-five percent (65%) of

annual room revenue is generated at the Hotel from SPG members.  Starwood Hotels and

Resorts, which owns Westin, was recently purchased by Marriott International, and the

SPG program is linked to the Marriott Rewards Program but will eventually be merged

into one program. The Debtor seeks authority hereby for the continuation of any such

integrated program.

b.    <u>Hotel and Restaurant Customer Deposits</u> – In the ordinary course of the Debtor's

business, customers deposit money with the Debtor, through its Managers, in connection

with Hotel stays, events and conventions, banquet room rentals, including for weddings,

corporate and local association functions, and per diem agreements, which amounts are

either applied to the customer's obligations or in certain instances refunded (the

"**Customer Deposits**").  As of June 30, 2017, the Restaurant related Customer Deposits

totaled approximately $518,555.93 and the Hotel related Customer Deposits totaled

approximately $1,143,309.46.

(i)    In the ordinary course of the Debtor's business, the Hotel accommodates a

significant number of group-related functions, corporate meetings, and catering events

throughout the year. These events include weddings, association and corporate meetings,

and local municipality and other social functions.  Approximately sixty percent (60%) of

the total revenues, or $14.6 million, received at the Hotel for 2016 were generated by

such events. The Hotel requires advance deposits for all upcoming meeting and catering

events. These deposits range in dollar amount from $500 to $45,000 depending on the

total estimated cost of the event.  In addition, one contract customer who maintains a

consistent block of rooms committed at a stipulated contract rate for an extended period

over 30 days with payment guaranteed regardless of use, maintains a petty cash fund with

the Debtor for its employees' per diem allowances for personal use during their stay at

the Hotel, which averages about $230,000 at any one time.  This customer is extremely

valuable to the Debtor and represents over $1.4 million of revenue for the Hotel per year.

(ii)    The Restaurant also accommodates banquet events within its four private

dining room spaces, which have seating capacity ranging from 12 to 350 people.  The

majority of the banquet events are weddings, but corporate and local association

functions are also accommodated.  The Restaurant requires advanced deposits for all

banquet events. These deposits range in dollar amount from $250 to $25,000, depending

on the total estimated cost of the affair.  Total revenues generated by banquets for year-

end 2016 amounted to $1,690,228 representing approximately twenty-eight percent

(28%) of total revenues generated at the Restaurant.

(iii)   The inability to honor the Debtor's Customer Deposit obligations through

either application of the delivered deposit to the cost of an event in accordance with the

terms of the prepetition agreement entered or refund of that deposit in the event of a

contract-compliant cancellation, will jeopardize future business and give rise to

considerable claims against the Debtor.  Given that a not insignificant portion of those

deposits are entitled to the priority afforded consumer deposits under section 507(a)(7) of

the Bankruptcy Code and further given that all event contract counterparties would likely

be entitled to invoke the doctrine of recoupment to reduce any payment obligation that

the Debtor asserted to be due in a final invoice for an event that did not credit the already

delivered deposit, grant of the relief requested is both statutorily warranted and sound business judgment.

c.      Gift Certificates -  The Restaurant offers three types of gift certificate programs. First, it offers a holiday promotion during certain holiday(s) where if the customer spends $100 on a gift card, they receive a bonus $25 gift certificate. These cards have an expiration date, and as of June 30, 2017, the Restaurant recognizes a liability of $0 for gift certificates associated with this specific program. Second, throughout the year, the Restaurant offers gift cards which do not have an expiration date.  As of June 30, 2017, the outstanding liability for such gift cards was $46,921.  Finally, the Restaurant issues paper gift certificates to brides that host their weddings at the Restaurant.  As of June 30, 2017, there was $3,255 in such outstanding gift certificates to brides. These gift certificates expire one-year after issuance. Although the Hotel no longer offers a gift card program and, therefore; no longer issues new gift cards, pre-existing gift cards are still honored.  As of June 30, 2017, there was $1,105 in outstanding gift certificates at the Hotel.

d.      Reservation and Referral Agent Fees Programs – The viability of the Hotel and Restaurant during the Chapter 11 Case is dependent upon the continued patronage and loyalty of referral agents as well as the availability of online booking or reservation systems.  For instance, the Restaurant utilizes OpenTable, an online reservation service. The service is free to customers but the Restaurant is charged both a flat monthly fee and a per reservation fee.  OpenTable provides online reservations for approximately 37,000 restaurants worldwide and accommodates about 19 million customers per month.  The Restaurant pays approximately $14,000 per year for this service and generates an

estimated $500,000 annually from customers utilizing this service.  Participation in this

program is essential to the Restaurant in order to successfully compete with local

restaurants in the area by attracting incremental guests that would otherwise dine

elsewhere. The Hotel utilizes Worldwide Payment Systems to compensate travel agencies

that generate business. In 2016, the Hotel paid approximately $90,000 for these services,

which, in turn, generated approximately $529,000 in revenue for the Hotel.  In addition,

the Hotel is listed on several online travel agency websites.  Expedia Inc.is one such

online travel agency which generated approximately $600,000 of revenue for the Hotel in

2016.  Accordingly, it is essential to the Debtor's business that it remain current with

these reservation and/or referral agent programs and vendors, lest it lose these significant

sources of revenue that they generate, thereby harming the Debtor's estate and impairing

its ability to reorganize.  Clearly, these services generate revenues that are far in excess of

their fees.

e.      <u>Credit Card Programs</u> – The Debtor is a party to certain agreements with credit

card companies and processors which enable the Debtor to accept credit card and debit

card payments, subject to certain adjustments, returns, promotional fees and refunds.  The

Hotel and Restaurant each accept Mastercard, American Express, Visa, and Discovery.

The average credit card processing cost for a retail business is roughly two percent (2%)

of revenues. When a customer uses a credit card to pay for services, the card is swiped

and an electronic payment is made to the Restaurant or Hotel, as applicable, one to two

days after the transaction occurs along with associated settlement charges.  On average,

the Hotel paid approximately $28,100 per month in credit card commissions and

processing fees in 2016 or approximately 1.8 % of total credit card receipts.

Approximately seventy-six percent (76%) of Hotel customers pay for services with credit cards representing approximately $18.8 million annually or $1.6 million monthly. On average, the Restaurant paid approximately $154,100 in credit card commissions and fees in 2016 or approximately two percent (2%) of total credit card receipts.  Approximately seventy-five percent (75%) of Restaurant customers pay with credit cards representing approximately $4 million annually or $500,000 monthly.  If the Debtor fails to pay these credit card related fees timely, it is likely that credit card companies or processors would suspend or terminate the Debtor's ability to accept some or all credit card payments  post-petition.  The ability to accept credit cards at the Hotel and Restaurant is imperative for the viability of the Debtor's business.

## V.   CERTAIN OTHER SUPPLEMENTAL RELIEF TO BE SOUGHT AFTER PETITION DATE

80.     In addition to the First-Day Motions that will be filed on the Petition Date, the Debtor will be requesting other Supplemental Relief in the month following the Petition Date including, without limitation, those motions described below.  I believe that the relief described below is essential to the success of the Chapter 11 Case and to the Debtor's ability to pursue the Consensual Restructuring and otherwise to maximize the value of its estate for the benefit of creditors.

## A.   Prepetition Lien Claims Motion

81.     The Debtor is filing a motion (the "**Prepetition Lien Claims Motion**") for authority to pay (i) certain claims entitled to administrative priority under section 503(b)(9) of the Code (the "**503(b)(9) Claims**" and, the holders of such claims, "**503(b)(9) Claimants**"), (ii) prepetition claims arising under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 181 *et seq.* ("**PACA Claims**" and, the holders of such claims, "**PACA**

**Claimants**"), and (iii) mechanics' and other possessory liens against the Debtor's property that arise from prepetition claims (the "**Lien Claims**").

82.    503(b)(9) Claims  - Due to the nature of the business of the Project, the Debtor received a significant amount of goods in the ordinary course of business from various vendors, and specifically, the 503(b)(9) Claimants, within the 20 days before the Petition Date.   Based on an analyses of the Debtor's prior monthly expenditures, the Debtor typically incurs debts each month for 503(b)(9) Claims that consist of food and beverage supplies, goods and inventory, meals, and energy supply, that totals about $470,000, consisting of about $320,000 for the Hotel and $150,000 for the Restaurant.  Many of the Debtor's relationships, through its Managers, are not governed by long-term contracts.  Rather, the Managers often obtains essential goods on an order-by-order basis.  I believe that certain 503(b)(9) Claimants may cease delivering goods, restrict the existing trade terms with the Debtor, or demand payment in advance or cash on delivery, further impairing the operations of the Debtor with respect to the Project.  The payment of certain 503(b)(9) Claims is in the best interest of the Debtor's estate because favorable trade terms will prevent foreseeable disruptions to the Debtor's operations and the Court's time and resources will not be burdened with numerous motions from individual vendors requesting payment on account of their administrative priority expense claims.

83.    PACA Claims  - The Debtor's Hotel and Restaurant operations purchase a fair amount of produce that is likely to result in PACA Trust type claims.  Based on an analyses of the Debtor's prior monthly expenditures, the Debtor typically incurs debts each month for PACA Claims that totals about $30,000.[6]  Because such claims are entitled to a superpriority over all unsecured and secured claims, and also since such claims if asserted, can create expensive and

---

[6]    Note, however, that most, if not all, of the sellers of produce to the Debtor are on terms requiring payment within 30 days of delivery, and as a result, approximately 2/3rds of these PACA Claims are likely duplicative of, and constitute, 503(b)(9) Claims, that are described in the prior paragraph.

needless PACA trust litigation, the Debtor is requesting authority to pay <u>undisputed</u> pre-petition

claims of PACA Claimants arising from the delivery of produce in the ordinary course of

business, or as soon as possible thereafter.

84.    <u>Lien Claims</u> - The Debtor, primarily through the Managers, routinely transacts

business with a number of Third-Party Contractors that can assert a variety of statutory, common

law, or possessory liens against the Debtor and its property if the Debtor fails to pay for certain

goods delivered or services rendered.  These Third-Party Contractors perform various services

for the Debtor, including the installation and repair of certain equipment in the Hotel or

Restaurant, maintenance and improvement of the Project (including the Debtor's elevators,

HVAC and fire protection systems, boilers and chillers, plumbing, and other infrastructure

items), and other repair, renovation, or construction of the facilities and property therein.  The

Debtor depends on these Third-Party Contractors to provide these services or materials to ensure

that the Hotel and Restaurant remain in good condition and repair, that operations are

uninterrupted, and that the Debtor's facilities remain in compliance with regulations or

agreements.  Without these services, the Debtor would simply be unable to operate the Hotel and

Restaurant in the ordinary course.  Based on an analyses of the Debtor's prior monthly

expenditures, the Debtor typically incurs debts each month to Third-Party Contractors for

potential Lien Claims that average about $23,000, however, actual amounts can fluctuate

significantly from month to month.   Although the Debtor generally makes timely payments to

the Third-Party Contractors, some may not have received payment for certain prepetition goods

and services.  As a result, the Third-Party Contractors may refuse to perform further services on

jobs that may not be completed, which could end up costing more to the Debtor should it have to

rely on other contractors to finish the work.  Accordingly, failure to pay the Lien Claims may

jeopardize the Debtor's operations.

**B.**     **Claims Agent Motion**

85.     The Debtor will be filing a motion to authorize the retention and employment of

Epiq Bankruptcy Solutions, LLC ("**Epiq**") as noticing, claims, and/or solicitation agent, as the

case may be, retroactive to the Petition Date (the "**Claims Agent Motion**") in accordance with

the terms and conditions set forth in Epiq's Retention Agreement that will be attached as Exhibit

A to such motion.

86.     I believe that the Debtor has potentially over 500 creditors on the Petition Date

thereby requiring the retention of a noticing agent based on the Local Rules.  It will also save the

Debtor, their counsel and/or the court clerk's office, as the case may be, significant time and

expense required to, among other things: (a) send out notices to numerous creditors in the

Chapter 11 Case, especially in connection with notice of a claims bar date and Plan voting and

solicitation; (b) provide creditors and other parties-in-interest with a repository for information

concerning the Chapter 11 Case; (c) manage the processing of claims and maintenance of a

register therefor; and/or (d) otherwise provide logistical support as needed in the Chapter 11

Case, including with respect to balloting on a plan.

87.     Prior to the Petition Date, I solicited and received quotes from several

experienced nationwide firms offering noticing-and-claims services.  Epiq ultimately quoted a

price that was commensurate with the other firms.

88.     I believe that the relief requested in the Claims Agent Motion is in the best

interest of the Debtor's estate, its creditors, and all other parties in interest, and will enable

management and professionals of the Debtor to dedicate their time and effort toward preparing

and presenting a Plan in conformity with the Consensual Restructuring.

## C.    Utilities Motion

89.    The Debtor will request the entry of an order authorizing payment of deposits as

adequate assurance of payments for utility services, and prohibiting the utility companies from

altering, refusing to provide, or discontinuing the utility services, or discriminating against the

Debtor solely on the basis of the commencement of the Chapter 11 Case or on account of any

unpaid invoice for services provided prior to the Petition Date (the "**Utilities Motion**").  During

the time it takes the Debtor to prepare and present its Plan for a Consensual Restructuring in the

next few months, it is important that utilities services continue uninterrupted.  I believe that the

Debtor's proposed procedures set forth in the Utilities Motion which will govern the utility

companies' requests for adequate assurance are appropriate in the Chapter 11 Case.   I believe

that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its

creditors, and all other parties in interest, and will enable the Debtor to continue to efficiently

administer the Chapter 11 Case without disruption.

## D.    Motion to Assume RSAs

90.    Under the terms of the RSAs, the Debtor will seek and must obtain the

assumption of the RSAs under section 365 of the Bankruptcy Code within thirty (30) days of the

Petition Date.

91.    The only way the Project is ever to regain its footing is through the collective

willingness of the major stakeholders in the Project to commit to the resuscitation of the

enterprise by implementing a holistic revamping of its debt-service obligations while

simultaneously setting aside needed sums for capital work.  At long last, the parties have

negotiated a long-term restructuring, founded upon the complex interplay of reworked

management agreements, modified debt service obligations and debt service instruments, and

substantial infusions from the Village over time. The parties contemplate a bankruptcy

proceeding that is short-lived and anticipate asking the Court to approve their "Consensual

Restructuring" in an abbreviated timetable.

92.    The RSAs provide the principal underpinnings of the Consensual Restructuring.

The RSAs bind the parties to support the Consensual Restructuring while building in a series of

benchmarks designated as "Restructuring Milestones" designed to guide the process and to

achieve approval of the Consensual Restructuring under an admittedly aggressive timetable in

recognition that the sooner the Project can emerge from bankruptcy, the sooner any further

property or operational deterioration can be prevented, capital improvements can be

implemented, and improved operating results will take shape.

93.    The RSAs impose affirmative covenants on the Plan Support Parties, the Village,

and the Managers to vote in favor of the Plan, and to support, or not oppose, the related relief the

Debtor intends to seek in this Chapter 11 Case to accomplish the Consensual Restructuring.  The

RSAs also contains a reasonable "fiduciary out" that permits the Debtor to consider or pursue

any alternative proposals that provide higher or better recoveries for this estate. This safeguard

represents the recognition by the parties (and the Debtor in particular), that while the Consensual

Restructuring is both viable and in the best interests of the estate, such a determination can never

remain static or unchallengeable. The Global RSA also sets out the pathway for achieving

confirmation in conjunction with the introduction of related measures for maintaining the

operations of the Project during the pendency of the proceeding, such as the extension of needed

debtor in possession financing ("DIP Financing"); the consent to the use of Cash Collateral to

pay all Operating Expenses; the provisional assumption of the management agreements; and the collective commitment of the parties to negotiate and present to the Court the seminal documents forming the guts of the Consensual Restructuring.

94.    The Debtor and the supporting interested parties believe that implementing the Consensual Restructuring is the best means of rehabilitating the Debtor.  The RSAs are the blueprint for the Consensual Restructuring, and its assumption is an essential first step in its implementation.  The most likely alternative to the Consensual Restructuring is a sale or forced liquidation, either of which will provide only a sure, but minimal, recovery to one stakeholder (i.e., the senior secured liens of the Series A Bondholders).  Accordingly, I believe that the assumption of the RSAs is an exercise of sound business judgment, is in the best interests of the estate, and should be approved.

**E.    Chapter 11 Counsel Motion**

95.    The Debtor has selected the law firm of Adelman & Gettleman, Ltd. ("**A&G**") as its insolvency and restructuring counsel in the Chapter 11 Case.  Prior to the Chapter 11 Case, the Debtor retained A&G beginning in approximately 2013 to assist the Debtor in analyzing its alternatives and effectuating a course of action to address the Debtor's financial difficulties.  I believe the continued representation of the Debtor by A&G is critical to the success of the Chapter 11 Cases because, among other things, the firm is familiar with the Debtor's business and legal affairs leading into the Chapter 11 Case.

96.    The Debtor selected A&G because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, and now-comprehensive experience with and knowledge of the Debtor and its business, and the goals in the Chapter 11 Case.  Accordingly, I believe the

Debtor should seek to retain A&G under a general retainer for their professional counseling and legal services in connection with the Chapter 11 Cases.

## F.    Special Corporate Counsel Motion

97.    The Debtor has long retained the firm of Klein, Thorpe, & Jenkins, Ltd. ("KTJ"), as its corporate counsel to handle a variety of legal issues including, without limitation, corporate, real estate, contract, and construction.  KTJ is very familiar with the Debtor's business and legal affairs, having provided a broad array of legal services to the Company since its inception including negotiating many of the formation, debt, and management agreements that still apply today and that will be needed to be revised or amended in connection with the Consensual Restructuring.  KTJ is familiar with various outstanding and continuing legal issues involving, among other things, corporate, real estate, construction, and contract (collectively, the "Special Corporate Counsel Matters"), and has been involved with the active negotiations with various parties to the RSAs during the years leading up to the Petition Date.

98.    I believe that KTJ has considerable experience in connection with the Special Corporate Counsel Matters, and that accordingly, the Debtor should seek to retain the firm to represent it in connection therewith.

## G.    Special Bond Counsel Motion

99.    The Debtor has long retained James D. Shanahan, now of the firm of Taft, Stettinius & Hollander LLP ("TSH"), as its bond and tax counsel to handle a variety of legal issues relating to the Indenture and the Bonds.  TSH, through Mr. Shanahan, is very familiar with the Debtor's business and legal affairs, having provided a broad array of legal services to the Company since its inception through his former firm, Shanahan & Shanahn, LLP, which firm had negotiated the Indenture and related documents which still apply today and that will be

revised or amended in connection with the Consensual Restructuring.  TSH is familiar with

various outstanding and continuing legal issues involving tax exempt bonds (collectively, the

"Special Bond Counsel Matters"), and has been involved with the active negotiations with

various parties to the RSAs during the years leading up to the Petition Date.

100.    I believe that TSH has considerable experience in connection with the Special

Bond Counsel Matters, and that accordingly, the Debtor should seek to retain TSH to represent it

in connection therewith.

## H.    EisnerAmper Retention as Financial Consultant

101.    The Debtor has selected my firm, EisnerAmper as its financial advisors in the

Chapter 11 Case.  EisnerAmper has provided substantive and beneficial services to the Company

for approximately two years prior to the Petition Date, and is very familiar with its business

operations.

102.    As stated, since then my firm, primarily through the services of myself and

Deborah Friedland, has advised the Debtor with respect to various restructuring options and

initiatives, actively participated in the negotiations with all of the relevant constituencies that are

now parties to the RSAs, and reviewed and prepared analyses of both past performance and

future projections in connection with those negotiations and with the Consensual Restructuring

and the filing of this Chapter 11 Case. In addition, EisnerAmper, through primarily the services

of Deborah Friedland, has provided the Debtor with hospitality management and operational

expertise in connection with the Debtor's efforts to review its existing operations under the

Managers, pursue, review, or help implement possible alternatives and improvements to such

operations, and ultimately to negotiate with the existing Managers and the Plan Support Parties

for new Management Agreements in connection with the Consensual Restructuring.  The Debtor

does not have employees with the expertise provided by my firm and that is needed in connection with this Chapter 11 Case and the implementation of the Consensual Restructuring.

103.    As discussed further in the relevant motion, EisnerAmper will concentrate its efforts on assisting and guiding the Debtor with the preparation of, among other things, cash flow budgeting and management, support development of projections and financial data needed in connection with confirming the Plan, preparing the bankruptcy schedules and statement of financial affairs, and through the efforts of Ms. Friedland, taking on certain needed tasks previously performed by the Asset Manager relating to oversight services concerning the Managers and the operations and providing any recommendations concerning same to the Debtor relative to the ongoing performance of the Hotel and Restaurant.

104.    I believe that my firm has substantial familiarity and experience with the Debtor's assets and business operations as set forth above and in the motion.  In addition, and as stated, my firm has considerable experience in Chapter 11 cases as well as hotel and hospitality matters, and is well qualified to aid the Debtor in this Chapter 11 Case.

## I.    Motion Extending Time to File Certain Schedules and Statements

105.    The Debtor will request the entry an order extending the time beyond the 14 day period required by the Bankruptcy Rules by at least an extra 31 days to file (a) schedules of assets and liabilities; (b) a schedule of current income and expenditures; (c) a schedule of executory contracts and unexpired leases; and (d) a statement of financial affairs (collectively, the "Schedules and Statements").

106.    While my firm has commenced the task of gathering the necessary information to prepare and finalize what will be lengthy and comprehensive Schedules and Statements, I believe

that the initial fourteen-day period required by the Bankruptcy Rules will be insufficient to permit the accurate and full disclosure of its complicated business and financial affairs.

107.    The task of compiling accurate Schedules and Statements for the Debtor is especially time-consuming in this case due to the need for my firm to work with, and gather and integrate the necessary information from each of, the Managers and their respective operations and records, which records are not usually updated on a monthly basis by the Managers until at least two or three weeks after the end of each month.  Moreover, given the size, length and complexity of the Consensual Restructuring negotiations that consumed the Debtor and its professionals, including my firm, in the months leading all the way up to the filing of the Chapter 11 Case, we have not had the opportunity to fully focus on compiling the necessary materials to complete the Schedules and Statements.

## VI.    CONCLUSION

108.    The Hotel and Restaurant industries are highly competitive.  Any loss or interruption or threatened loss or interruption in goods and services the Hotel and Restaurant provide to their customer base, could lead to a substantial loss in revenue as a result of customers choosing alternative hospitality venues.  Accordingly, the Debtor seeks the entry of orders granting the First Day Motions and the Supplemental Relief in order to minimize any loss to the value of the Debtor's assets and to stabilize its operations following the effects of the Chapter 11 Case filing.  I believe that if the Court grants the relief requested in each of the First-Day Motions and other motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtor's estate and creditors through the Consensual Restructuring, will be significantly enhanced.

(the rest of this page is intentionally blank)

(SIGNATURE PAGE TO DECLARATION OF THOMAS BUCK IN SUPPORT OF
CHAPTER 11 PETION AND FIRST DAY MOTIONS)

Dated: 7/28/17

THOMAS BUCK

## EXHIBIT A

### Summary of Plan Term Sheet[7]

| Series A-1 Bonds | |
|---|---|
| *Allowed Claims*:[8] | <u>Total Allowed Claims</u>: $71.30 million<br><u>Allowed Secured Claim</u>: $54.73 million<br><u>Allowed Deficiency Claim</u>: $16.57 million<br>(Term Sheet, at §§ 8 and 19) |
| *Bond Insurer Payment* | Payment of $660,000 from Bond Insurer immediately prior to conversion of Series A-1 Bonds in exchange for cancellation of the Surety Bond and assignment of the rights under the applicable Series A-1 Bonds.<br>(Term Sheet at §4(a)) |
| *Restructured Series A-1 Bonds*: | Existing Series A-1 Bonds will be exchanged for:<br>• $33.1 million of Series A-1 Hard Bonds with an interest rate of 5.5% and a 39 year term (Term Sheet at § 8); and<br>• $21.63 million of Subordinate Series A-1 CABs with an interest rate of 5.25%.  The Subordinate Series A-1 CABs consist of serial bonds maturing on January 1 of each year beginning in 2047 and ending in 2067 (Term Sheet at § 11).<br>Prepetition first liens will be maintained to secure payment of the Series A-1 Hard Bonds and the Subordinate Series A-1 CABs.  (Term Sheet at § 8) |
| Series A-2 Bonds | |
| *Allowed Claims*:[2] | <u>Total Allowed Claims</u>: $58.21 million<br><u>Allowed Secured Claim</u>: $44.48 million<br><u>Allowed Deficiency Claim</u>: $13.72 million<br>(Term Sheet at §§ 9 and 19) |
| *Restructured Series A-2 Bonds*: | Existing Series A-2 Bonds will be exchanged for:<br>• $26.90 million of Series A-2 Hard Bonds with an interest rate of 5.0% and a 39 year term. *(*Term Sheet at § 9); and<br>• $17.58 million of Subordinate Series A-2 CABs with an interest rate of 5.25%.  The Subordinate Series A-1 CABs consist of serial bonds maturing on January 1 of each year beginning in 2047 and ending in 2067.  *(Term Sheet* at §§ 9; 11).<br>Prepetition first liens will be maintained to secure payment of the Series A-1 Hard Bonds and the Subordinate Series A-2 CABs.  (Term Sheet at § 9) |

---

[7] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings set forth in the Global RSA and Restructuring Term Sheet that is attached as exhibit A to the Global RSA (the "**Term Sheet**"), as applicable.  All summaries and discussions of the various provisions of the Term Sheet are qualified in their entirety by the actual provisions set forth therein.

[8] All claim amounts included herein for the Series A Bonds and Series B Bonds are approximate amounts. The allowed amount of such claims shall also include accrued and accruing interest and other fees and costs through the Effective Date.  Therefore, these amounts may change.

517763                                    43

| | |
|---|---|
| *Bond Insurer Commutation Offer* | Holders of Series A-2 Bonds shall have the opportunity to receive, ***on an opt out basis***, the following, in full satisfaction of the Bond Insurer's obligations under the Bond Insurance Policy:<br><br>• 0.20 times the amount of Series A-2 Bonds held by such holder <u>plus</u><br>• their pro rata share of the Series A-2 Hard Bonds and the Subordinate Series A-2 CABs. *Id*. at § 18.<br><br>There will be no release of any obligations of the Bond Insurer under the Bond Insurance Policy with respect to Non-Commuting Holders. *Id*. at § 18. |

**Series B Bonds**

| | |
|---|---|
| *Claims:*[2] | <u>Total Allowed Claims</u>: $48.42 million<br><u>Allowed Secured Claim</u>: $41.85 million<br><u>Allowed Deficiency Claim</u>: $6.57 million<br>(Term Sheet at §§ 13 and 19). |
| *Restructured Series B Tax Revenue Bonds*: | Existing Series B Bonds will be exchanged for:<br>• $19.40 million of Restructured Series B Tax Revenue Bonds with an interest rate of 3.75% through 2021 and then 4.0 % to maturity and a 34 year term (Term Sheet at § 13); and<br>• $22.45 million of Subordinate Series B CABs with an interest rate of 4.0%.   The Subordinate Series B CABs consist of serial bonds maturing on January 1 of each year beginning in 2046 and ending in 2067 *(*Term Sheet at § 14).<br>Prepetition first liens, subordinate in order of payment to the Restructured Series A Bonds, will be maintained to secure repayment of the Restructured Series B Tax Revenue Bonds and the Subordinate Series B CABs.   In addition, the prepetition pledge of tax rebates will be maintained, including the pledge of the Additional Places for Eating Tax. (Term Sheet at § 13). |

**Series C Bonds**

| | |
|---|---|
| *Claims:* | Estimated outstanding amount of the Series C Bonds is $71.73 million. The Series C Bonds are subordinate in order of payment to the Series A and Series B Bonds. |
| *Treatment:* | Cancelled and extinguished on the Effective Date.  (Term Sheet at § 15) |

**Other Claims**

| | |
|---|---|
| *Treatment of Other Claims:* | Claims of unsecured creditors and all other claims not specifically addressed in the Term Sheet, including without limitation claims arising in favor of Westin, the Restaurant Manager, the unsecured deficiency claims of the Series A and Series B Bonds and the Asset Manager, shall be treated in a manner reasonably acceptable to the Required Plan Support Parties. *(*Term Sheet *at* § 19). |

**Village Agreements and Contributions**

| | |
|---|---|
| *Contribution*: | The Village will pay $3.0 million to the LPFC on the Effective Date to fund capital expenditures and continue to contribute the places for eating tax through 2021 to LPFC for payment of the Restructured Series B Bonds plus the Additional Places for Eating Tax. (Term Sheet at § 3(a)-(i)). |

| | |
|---|---|
| *TIF District*: | The Village will create a TIF District and enter into a TIF Redevelopment Agreement with the LPFC, which provides for the payment of up to $3.7 million in TIF incremental revenues to the LPFC on the terms and for the purposes set forth in the Term Sheet. (Term Sheet at § 3)<br><br>If the Village does not meet certain requirements relating to the formation of the TIF District or payment of the TIF Note, monies are due and owing from the Village to the LPFC as set forth in the Term Sheet.  (Term Sheet at §§ 3(D), (G) and (H)) |
| *Tax Rebate Agreement:* | Tax Rebate Agreement will be amended and assumed by LPFC. (Term Sheet at § 16).  A portion of the Additional Places for Eating Tax relating to the Project will be used to fund capital expenditures and debt service consistent with the Term Sheet. (Term Sheet at § 16) |
| *Release:* | The Village will receive the releases provided under the Term Sheet from the Plan Support Parties for the claims described in Section 3 of the Term Sheet. (Term Sheet at § 3(j)) |

**DIP Financing**

| | |
|---|---|
| *DIP Budget & DIP Order:* | The Trust Estate Funds will be loaned by the Trustee to LPFC in accordance with the terms of the DIP Budget and DIP Order.  (Term Sheet at § 4) |
| *Plan Treatment:* | DIP Financing forgiven on the Effective Date of plan of reorganization in a form acceptable to the Required Plan Support Parties. |

**Hotel**

| | |
|---|---|
| *Hotel Management Agreement* | Westin will continue to perform under the Existing HMA during the Chapter 11 Case.  A New HMA will take effect on the Effective Date and the Existing HMA will be rejected.  (Term Sheet at § 21) |
| *Hotel Capital Expenditure Fund* | On or about the Effective Date, $6,520,000, less amounts expended for capital in 2017, will be deposited into the Hotel Capital Expenditure Reserve Fund. (Term Sheet at § 5) |
| *Restaurant Management Agreement* | The Restaurant Manager will continue to perform under the existing Restaurant Management Agreement during the Chapter 11 Case.  A New RMA will take effect on the Effective Date and the existing Restaurant Management Agreement will be rejected.  (Term Sheet at § 23) |
| *Asset Management Agreement* | The existing Asset Management Agreement was terminated prior to commencement of the Chapter 11 Case.  A new asset manager will be retained and a new asset management agreement will be put in place on the Effective Date.  (Term Sheet at § 22) |