IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOMBARD PUBLIC FACILITIES CORPORATION, | ) ) | Case No. 17-22517 |
| | ) | Honorable Jacqueline P. Cox |
| Debtor. | ) | |
| | ) | **Status Hearing Date and Time:** |
| | ) | **September 19, 2017 at 10:00 a.m.** |

### ACA FINANCIAL GUARANTY CORPORATION'S OBJECTION TO MOTIONS TO DISMISS AND JOINDER TO THE DEBTOR'S RESPONSE

ACA Financial Guaranty Corporation, the bond insurer for the Series A-2 bonds in the approximate amount of $58 million, the Controlling Party under the Indenture and a holder of certain of the Series A-2 bonds ("**ACA**"), files this objection to the Motions to Dismiss[1] and joinder to the response (the "**Response**") filed by Lombard Public Facilities Corporation, debtor and debtor in possession (the "**Debtor**"), and respectfully states as follows:

#### Preliminary Statement

The Debtor is eligible to file for chapter 11 relief under the express terms of sections 109(b) and (d) of the Bankruptcy Code. The Debtor is an Illinois not-for-profit corporation that owns a Westin Hotel with two restaurants. The eligibility inquiry is simple, straightforward and should end here.

Movants have asserted a single basis for dismissal of the chapter 11 case—that the Debtor constitutes an "instrumentality" of the Village and is therefore ineligible for relief under chapter 11. This misguided assertion is based upon two unpublished decisions and ignores the *published* decisions from the Bankruptcy Court in the Monorail Case, 729 B.R. 770 (Bankr. D.

---

[1] All otherwise undefined terms herein have the meanings set forth in the Response.

*ORL299616997*

Nev. 2010), and the Bankruptcy and District Court for the Western District of Kentucky, *Kentucky Employees Retirement System v. Seven Counties Services, Inc. (In re Seven Counties Services, Inc.)*, 511 B.R. 431 (Bankr. W.D. Ky. 2014), *aff'd* 550 B.R. 741 (W.D. Ky. 2016), *appeal docketed* No. 16-5664 (6th Cir. May 13, 2016). For all of the reasons set forth in the Response and herein, the Debtor is not an instrumentality of the Village and therefore is eligible to file for chapter 11 relief.

The Debtor should be allowed to move forward with its chapter 11 case, restructure its debt and implement the consensual restructuring that is overwhelmingly supported by the major constituents to ensure that the Hotel survives, value is maximized and jobs are saved. The Debtor's consensual restructuring has been negotiated among the major constituents—the Debtor, ACA, the Village, Nuveen Asset Management, OppenheimerFunds, Westin, and the Restaurant Manager—over the past four years. Over 70% of the bondholders support this restructuring. All major constituents have signed restructuring support agreements and agreed to material economic accommodations to facilitate the restructuring, which will maximize value for all constituents. Lord Abbett, one of the Movants and a holder of 3% of the bond debt, has been involved in these restructuring discussions since at least 2015 and has elected, for its own reasons, not support this restructuring.

As discussed herein, the Debtor can only restructure its indebtedness through a chapter 11 plan of reorganization. Therefore, if this chapter 11 case is dismissed, the Debtor lacks any other option to restructure its debt. Instead, the Debtor would have to close the Hotel, resulting in a significant loss of jobs and value for the bondholders, vendors and service providers who do business with the Hotel. Alternatively, the Debtor would have to consent to a foreclosure process, resulting in a significant loss of value to the creditors. By filing chapter 11, the Debtor

2

is using the bankruptcy process as it was intended – to facilitate a restructuring that maximizes value for all constituents.

For all of these reasons, the Motions to Dismiss should be denied.

### Joinder and Additional Objections

ACA adopts all of the arguments advanced by the Debtor in its Response as if fully set forth herein. ACA further objects to the Motions to Dismiss and asserts that the Motions to Dismiss should be denied because: (i) the Debtor is not an "instrumentality" of the Village as Congress intended that term to be interpreted; (ii) the definition of "instrumentality" of a municipality has not been construed to include a legally distinct entity that owns a hotel and convention center; (iii) the practical realities foreclose any other type of bankruptcy relief for the Debtor; and (iv) all of the parties contemplated the possibility of the Debtor filing for chapter 11 when the Debtor issued its bonds.

A. **The Structure and Legislative History of the Bankruptcy Code Indicate that the Debtor is Not a "Governmental Unit" for Eligibility Purposes**

The Motions to Dismiss should be denied under the applicable tests set forth in the Monorail Case. This result is supported by the legislative history, which was thoroughly analyzed by the Bankruptcy Court in the Monorail Case, and the underlying policies of the eligibility provisions of the Bankruptcy Code. The key inquiry here is whether the Debtor is an "instrumentality of . . . a municipality" and therefore a "governmental unit" and ineligible for chapter 11 relief. The Bankruptcy Code defines the terms "governmental unit" as follows:

> (27) The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

3

*ORL299616997*

11 U.S.C. § 101(27). The Debtor has conceded that the Village constitutes a municipality. In determining whether the Debtor is an instrumentality of a municipality (the Village), the analysis begins with the plain language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("As long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."). As recognized by the case law examining the issue, however, there is no plain language interpretation for the term "instrumentality." Monorail Case, 429 B.R. at 777 ("[T]here really is no "plain meaning" of the term "instrumentality"—or, to be somewhat puckish, there are too many plain and accepted meanings—and it thus makes sense to look at the context and background of that term's use in the Bankruptcy Code."); *In re Hosp. Auth. of Charlton Cty.*, No. 12-50305, 2012 WL 2905796, at *5 (Bankr. S.D. Ga. July 3, 2012).[2]

Based on the ambiguity of the term, it is necessary to examine the legislative history to determine the intent of Congress in limiting access to chapter 11 for "governmental units." *See, e.g., United States v. Hudspeth*, 42 F.3d 1015, 1022 (7th Cir. 1994) (en banc) ("[W]e may turn to the legislative history to interpret a statute only when the statute is ambiguous."), *cert. denied*, 515 U.S. 1105, 115 (1995).

In defining the term "governmental unit" the legislative history explains:

> Paragraph (20) defines "governmental unit" in the broadest sense. The definition encompasses the United States, a state, commonwealth, district, territory, municipality or foreign state, and a department, agency or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. ***The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function***.

---

[2]  Attached hereto as **Exhibit A** is a true and correct copy of *In re Hospital Authority of Charlton County*, No. 12-50305, 2012 WL 2905796 (Bankr. S.D. Ga. July 3, 2012).

H.Rep. No. 95-595, 95th Cong., 1st Session 311 (1977), U.S. Code Cong. & Admin. News 1978, p. 5787 (1977), reprinted in App. C Collier on Bankruptcy, Pt. 4(d)(i), 4-1437 (emphasis added).

Both Movants rely solely on the first portion—that the term "governmental unit" is to be defined in the broadest sense—but ignore the limitation that Congress imposed on the term instrumentality: (i) that the entity must have an "active" relationship with the government, and (ii) that that entity must perform a "governmental function."[3]

As discussed in the Response, the Village had no day-to-day oversight or interaction with the Debtor. The day-to-day operations of the Project are conducted by the Operating Managers, who manage the affairs of the Hotel and Restaurant and are also charged with presenting budgets to the Debtor for approval. Further, the Debtor had engaged an Asset Manager, who oversaw the work of the Operating Managers and reported back to the Debtor's board. The Village has no authority, whatsoever, to dictate the operation of the Hotel, Italian Restaurant or Seafood Restaurant.

Additionally, the Debtor does not serve a traditional governmental function: certainly, the Debtor's ownership of a Hotel, an Italian Restaurant and a Seafood Restaurant does not constitute the performance of a "governmental function." Instead, the types of traditional municipality functions include "essential services such as police protection, fire protection, sewage and garbage removal, and schools." *See* H.R. Rep. No. 1011, 100th Cong., 2nd Sess. 1988, 1988 U.S.C.C.A.N. 4115, 4116. This is in recognition that a "municipality is different

---

[3] It is unclear whether Congress intended the term "governmental unit" to be defined broadly for purposes of limiting chapter 11 eligibility as opposed to broadening the scope of those entities entitled to preferential treatment under various provisions of the Bankruptcy Code, such as: (i) exception from the automatic stay pursuant to the police and regulatory powers (11 U.S.C. § 362(b)(4)); (ii) administrative expense treatment for taxes without the need for a notice and hearing (*id.* § 503(b)(1)(D)); (iii) an extended deadline to file proofs of claim (*id.* § 502(b)(9)); (iv) priority treatment for taxes (*id.* § 507(a)(9)); and (v) exceptions of certain of governmental unit debts to a debtor's discharge (*id.* § 523(a)(7), (8)). Congress could not have intended for a hotel and restaurant corporation to be considered a "governmental unit" and receive the same benefits designed for entities such as the Internal Revenue Service, the Department of Education, and the Environmental Protection Agency.

*ORL299616997*

from other debtors who file bankruptcy, because, unlike other debtors, a municipality cannot simply go out of business." *Id*. Here, the Debtor's bankruptcy has no impact on the Village's ability to provide essential public services.

Moreover, in making a determination as to whether a particular debtor is ineligible for bankruptcy relief, courts consider whether prohibiting the bankruptcy filing would frustrate the purposes of the Bankruptcy Code. *In re Estate of Medcare HMO*, 998 F.2d 436, 442 (7th Cir. 1993) (holding that, in determining whether a debtor is an insurance company and therefore ineligible for chapter 7 or chapter 11 "a court must nonetheless ensure that the classification would not "frustrate[ ] the full effectiveness [of the Code]") (alteration in original). "At its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 121 (3d Cir. 2004). In this regard, "[b]ankruptcy maximizes the repayment of an insolvent debtor's debts by overcoming the collective-action (or musical-chairs) problem that arises when each of the debtor's unsecured creditors races to seize the debtor's assets, when a more orderly liquidation, or a reorganization, would yield a larger total recovery." *United States v. Frontone*, 383 F.3d 656, 659 (7th Cir. 2004).

In light of these fundamental purposes of the Bankruptcy Code, section 109 of the Bankruptcy Code is written to make bankruptcy relief widely accessible, and exceptions to the availability of the remedies provided in title 11 are limited and carefully delineated. *See* 2 Collier on Bankruptcy ¶ 109.01[1] (16th ed. 2009). Thus, consistent with legislative history, the Debtor is not an instrumentality of the Village and is eligible for chapter 11 relief. Moreover, as discussed herein, if the Debtor is deemed ineligible to file, such outcome would frustrate the

6

purpose of the Bankruptcy Code by preventing an orderly reorganization process that maximizes value for all constituents.

### B. Nonprofit Corporations are Eligible and Routinely File Chapter 11

Nonprofit corporations, like the Debtor, can file for bankruptcy, just like private corporations, through various provisions of the Bankruptcy Code. *See Toibb v. Radloff*, 501 U.S. 157 (1991) (holding that an individual who was not engaged in any business may nevertheless file under chapter 11). As such, various nonprofit corporations, formed with ostensible public purposes, have filed chapter 11 without implicating the concerns expressed in the legislative history. *See In re Charles St. African Methodist Episcopal Church*, 478 B.R. 73, 85 & n.25 (Bankr. D. Mass. 2012) (holding that nonprofit corporations such as hospitals and universities can be eligible for chapter 11), *aff'd sub nom.*, *OneUnited Bank v. Charles St. African Methodist Episcopal Church of Bos.*, 501 B.R. 1 (D. Mass. 2013).[4]

For example, in 2013, the Lafayette Yard Community Development Corporation ("LYCDC") filed for chapter 11 relief in the United States Bankruptcy Court for the District of New Jersey. *See In re Lafayette Yard Cmty. Dev., Corp.*, Ch. 11 Case No. 13-bk-30752-MBK (Bankr. D.N.J. Sept. 23, 2013). Like the Debtor, LYCDC was a nonprofit organization that was formed to assist the City of Trenton and the State of New Jersey with a redevelopment project: the construction of a hotel and conference center in downtown Trenton (f/k/a the Trenton Marriot Downtown). *See Affidavit of Joyce Kersey in Support of Debtor's Chapter 11 Petition, "First*

---

[4] Indeed, various provisions of the Bankruptcy Code provide for separate treatment of non-profits. *See, e.g.*, 11 U.S.C. § 303(a) (prohibiting commencement of an involuntary case against a "corporation that is not a moneyed, business or commercial corporation"); *id.* § 1112(c) (prohibiting conversion of a chapter 11 case to chapter 7 if the debtor is a "corporation that it not a moneyed, business or commercial corporation, unless the debtor requests such conversion"); *id.* § 1129(a)(l6) (requiring that, as part of confirmation of a chapter 11 plan that "[a]ll transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust").

*Day Motions" and Emergency Interim Orders Authorizing the Debtor to Satisfy, and, to the Extent Applicable, Directing Payroll Banks to Honor, Certain Pre-Petition Gross Salaries and Payroll Taxes of its Employees Pending Hearing on "First Day Motions"* Ch. 11 Case No. 13-bk-30752-MBK (Bankr. D.N.J. Sept. 23, 2013) [ECF No. 2] (the "**Kersey Declaration**") ¶ 6.[5] Further like the Debtor, LYCDC financed the construction with tax-exempt bond funding ($31 million), outsourced the management of the hotel and conference center to third parties, and the debtor's board was wholly appointed by Trenton's mayor. *See id.* ¶¶ 8-10, 12-14; *see also* Official Statement of Lafayette Yard Community Development Corporation Hotel/Conference Center Project revenue Bonds, Refunding Series 2012 (City of Trenton Guaranteed) (Callable), dated March 21, 2012 (the "**LYCDC 2012 Official Statement**") at pg. 2.[6] And, like the Debtor, upon the repayment of the LYCDC bonds, the hotel was required to be transferred to the City of Trenton. Kersey Decl. ¶ 18.[7]

LYCDC had significant indicia of being an instrumentality, not present here with the Debtor, such as: (i) a prohibition on LYCDC from amending *any section o*f its bylaws without the approval of Trenton's mayor, and (ii) substantial funding from the City of Trenton and the State of New Jersey—including the City of Trenton guaranteeing the bonds, over $15 million in loans from the State and its agencies, and the New Jersey Economic Development Authority redeeming over 50% of the LYCDC bonds before the bankruptcy filing. *See* LYCDC 2012 Official Statement at pgs. 4, 9-10. Notwithstanding these facts, neither the UST's office, nor any creditor, nor the bankruptcy court challenged LYCDC's eligibility to file chapter 11. The

---

[5] Attached hereto as **Exhibit B** is a true and correct copy of the Kersey Declaration.

[6] The LYCDC 2012 Official Statement can be found at https://emma.msrb.org/EP620037-EP485379-EP885983.pdf. Attached hereto as **Exhibit C** is a true and correct copy of certain excerpts from the LYCDC 2012 Official Statement.

[7] Moreover, the parking garage connected to the LYCDC Hotel was owned by the Trenton Parking Authority, a separate municipal entity. Kersey Decl. ¶ 11.

LYCDC hotel and conference center was accordingly sold at auction providing for distributions for creditors that would have been wholly unavailable to creditors in the context of a foreclosure action.

### C. The Equities and Practical Realities Militate Against Granting the Motions to Dismiss

The major constituencies in this case have been negotiating the terms of a consensual restructuring for over four years. *See Declaration of Thomas Buck in Support of the Debtor's Chapter 11 Petition, First Day Motions and Other Relief* ¶ 16 [Docket No. 13] (the "**Buck Declaration**"). Moreover, notwithstanding the fact that Lord Abbett owns less than 3% of the overall bond debt, Lord Abbett has been actively negotiating the terms of the proposed restructuring since at least 2015, has been involved in the discussions and has elected not to support the restructuring.

All major constituents have agreed to significant concessions to support a consensual restructuring that will result in 290 employees keeping their jobs, vendors and suppliers having ongoing business relationships with the Project and a much improved Project that will maximize value for all constituents. These contributions[8] include:

- A $3 million cash contribution from the Village plus up to an additional $3.7 million of TIF District monies, all of which will fund necessary capital improvements at the Project;

- Allocation of a portion of the additional places of eating tax to capital improvements at the Project (monies otherwise belonging to the holders of the Series B bonds);

- Nearly a $37 million reduction in the outstanding principal amount of the Series A and Series B bond debt and extensions of the maturity dates of such bonds;

- Reductions in the required annual debt service to the Series A bondholders;

---

[8] A summary of the Contribution of Key Stakeholders is attached hereto as **Exhibit D**.

9

- An additional $1 million of key money from the Hotel Manager to fund capital improvements; and

- Reduced and delayed management fees from the Hotel Manager.

Based upon the substantial contributions and concessions made by the Village, major bondholders, the Hotel Manager, the Restaurant Manager, and ACA, the consensual restructuring provides for the best overall recovery to creditors in this case:

> The Consensual Restructuring provides a potential recovery of seventy-seven per cent (77%) (plus interest) to the Series A Bondholders (based on 7/1/17 outstanding balances), a potential recovery of nearly eighty-seven per cent (87%) (plus interest) to the Series B Bondholders (based on 7/1/17 outstanding balances), long-term management agreements for the Managers, a significant set-aside for needed capital improvements, necessary funding for this Chapter 11 Case, payment of Operating Expenses, and a continuing fully functional and vibrant hotel and convention center for the western suburban market that will continue to employ over 290 full and part-time employees.

*Id.* ¶ 27.

The Debtor has limited restructuring options outside of a chapter 11 proceeding because, as explained in the Debtor's Response, the Debtor is not considered a "unit of local government" by the State of Illinois and is not a "municipality" of Illinois under section 109(c) of the Bankruptcy Code. This categorization has two practical effects. First, the Debtor cannot avail itself of Illinois' financial-distress scheme to restructure its obligations. And second, the Debtor cannot avail itself of filing for bankruptcy under chapter 9 of the Bankruptcy Code if this chapter 11 case is dismissed.

Thus, without access to chapter 11, the Debtor has only two untenable options. The first option is an out-of-court restructuring. Based on the terms of the bonds, this option would require the consent of 100% of the bondholders. Assuming *arguendo* that each of the individual bondholders was capable of being located and willing to engage in a restructuring dialogue, there is simply no value to provide recoveries to certain classes of bondholders—especially given the

fact that senior claims are not being paid in full. Therefore, an out-of-court restructuring is simply not possible given that certain bondholders would receive no recovery and have no reason to agree to the restructuring. Moreover, the Debtor could not proceed with the existing restructuring given that Lord Abbett will not agree to the terms and, as the holder of 3% of the bonds, could block the restructuring.

The only other alternative is for the Indenture Trustee to foreclose. As described in the Buck Declaration, based on market prices for similar hotels, the proceeds of a foreclosure of the Project will result in a recovery of far less than ***one third of the balance of the series A bonds***, with no remaining funds available for any other bonds:

> What was clear early on in those negotiations, and what remains clear today, is that: (a) based on market prices for similar hotels, proceeds from a foreclosure of the Project will result in a recovery of less than one-third of the outstanding balance of the A Bonds, with no remaining funds available for any other Bonds, and (b) the continued operation of the Debtor, and a long-term restructure of the Bonds, through a Chapter 11 Plan will likely provide a far superior return for [Bondholders] and other parties in interest, than would a forced sale.

*See* Buck Decl. ¶ 16. In addition to the dramatic value destruction in terms of bondholder returns (estimated at up to 70-80% for the series A and B bonds), foreclosure would adversely impact various other parties in interest in this case, including employees, vendors and service providers. Such a result is abhorrent to the fundamental precepts of bankruptcy law as well as the parties' reasonable expectations in determining whether to buy the bonds, as discussed below.

### D. The Official Statement Contemplated the Debtor Being Eligible for a Bankruptcy Filing

Lord Abbett and UST's reliance on the representation that the Debtor is "an instrumentality of the Village for federal tax purposes" in the Official Statement is a red herring. *See* Lord Abbett Mot. ¶ 9; UST Mot. ¶ 11. First, that representation is qualified – the Debtor is only an instrumentality ***for federal tax purposes***. Instrumentality under federal tax law does not

11

ORL299616997

mean that that entity is an "instrumentality" for chapter 11 eligibility. *See* Monorail Case, 729 B.R. 770, 789-90 (Bankr. D. Nev. 2010) (holding that the Supreme Court rejected the argument that "a word used in one federal statute necessarily has the same meaning in another federal statute").

Secondly, if the Movants' position is true, then the Official Statement should have precluded the eventuality that the Debtor could file for any type of bankruptcy—but the Official Statement provided for the exact opposite.

As discussed above, the Bankruptcy Code is clear: an instrumentality of a municipality is a "governmental unit" and therefore barred from a chapter 11 bankruptcy. As such, there should have been *no risk* that the Debtor, as the bond Issuer, could file for bankruptcy. Nevertheless, the Official Statement is replete with references to the possibility of the Debtor's bankruptcy in the "Risk Factors" including:

> ***Should the Issuer go into bankruptcy***, there could be adverse effects on the Holders of the Bonds. The Issuer has been structured as a single-purpose entity, thereby significantly reducing the risk that bankruptcy of the Issuer could occur for any reason other than those arising from ownership and operation of the Project. ***In spite of its limited purpose, no assurances can be made that the Issuer will not file bankruptcy should the value of the Project decline in the real estate market or the Project not perform as expected***, or other events affecting the profitability of the ownership and/or operation of the Project occur.

Official Statement at pg. 116 (emphasis added).

> The enforceability of the rights and remedies of the Holders of the Bonds under the Indenture and the various other agreements and contracts described herein ***may be subject to bankruptcy, insolvency, reorganization, moratorium, redemption, fraudulent transfer and other similar*** laws affecting the rights of creditors generally, and the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or equity). ***Bankruptcy proceedings or the exercise of other powers of the federal government***, or the exercise of the police powers of the State, if initiated, could subject persons attempting to enforce rights and remedies to judicial discretion and interpretation of rights in bankruptcy or otherwise, and consequently may entail risks of delay, limitation or modification of rights.

12

*Id.* at pg. 114 (emphasis added).

> In addition, either the Hotel Management Agreement or the Restaurant Management Agreement may be terminated earlier upon the occurrence of certain events, ***including the bankruptcy*** of either operator or ***the Issuer***.

*Id.* (emphasis added).

Moreover, a chapter 9 bankruptcy was not contemplated for the Debtor because the Risk Factors in the Official Statement expressly provided that a bond repayment may be recoverable as a preference—which is prohibited in a chapter 9 bankruptcy. Specifically, the third risk factor under the ***Bankruptcy of the Issuer*** section of the Official Statement provided:

> Third, payments previously made to the holders of the Bonds during the 90 days immediately preceding the filing of a bankruptcy petition might be avoided as preferential payments, so that the holders would be required to return such payments to the Issuer.

*Id.* at pg. 116. A chapter 9 debtor <u>cannot</u> bring a preference action against bondholders for payments on account of bonds. *See* 11 U.S.C. § 926(b) ("A transfer of property of the debtor to or for the benefit of any holder of a bond or note, on account of such bond or note, ***may not be avoided*** under section 547 of this title.") (emphasis added). Thus, the Official Statement contemplated both: (i) the Debtor's bankruptcy filing and (ii) that that filing will be made in a chapter other than chapter 9 of the Bankruptcy Code (i.e., chapter 7 or chapter 11).

For all the foregoing reasons, the Debtor is not an instrumentality of the Village and therefore not a governmental unit under section 101(27) of the Bankruptcy Code. As such, the Debtor is eligible for chapter 11 relief.

### **<u>Reservation of Rights</u>**

ACA expressly reserves its right to further object to the Motions to Dismiss and any responsive pleadings filed in connection therewith and raise additional arguments at any hearing to consider the Motions to Dismiss.

**Conclusion**

**WHEREFORE**, in consideration of this Joinder and the Debtor's Response, ACA respectfully requests that this Court enter an order denying the Motions to Dismiss and granting any and all relief as this Court deems just and proper.

Dated: August 29, 2017                           Respectfully Submitted,

                                                          ACA FINANCIAL GUARANTY
                                                          CORPORATION

                                                          By:    /s/ Nancy A. Peterman
                                                                Nancy A. Peterman

                                                          Nancy A. Peterman (ARDC #6208120)
                                                          GREENBERG TRAURIG, LLP
                                                          77 West Wacker Drive, Suite 3100
                                                          Chicago, Illinois 60601
                                                          (312) 456-8400
                                                          (312) 456-8435 (fax)
                                                          PetermanN@gtlaw.com